I am honored today to represent American servicemembers and Gold Star family members whose loved ones served our country in Afghanistan until they were injured or slain by al-Qaeda and its terrorist allies. Our complaint for aiding and abetting has two features that we think make it uniquely strong for the pleading stage. First, we allege that the defendants acted with highly fulfillable, often criminal intent. After the September 11 attacks, the international financial community rallied to implement robust safeguards to thwart al-Qaeda financing schemes including money laundering and meth fraud. The defendant banks sought to profit by breaking those very rules, developing bespoke criminal schemes to attract business from terrorist financiers and money launderers in high-risk geographies. Those acts have resulted in multiple findings of culpability. Standard Chartered Bank also acted as a major banker for al-Qaeda's principal supplier of explosive materials. As a district court in this circuit explained, Standard Chartered carefully tailored financial instruments to fund production of a known IED ingredient known to be sold to terrorist groups known to be attacking U.S. servicemembers, just playing an active and culpable role in the explosive supply chain. The second feature of our complaint is that we allege, based on the conclusions of U.S. government officials and counterterrorism experts, that the defendants' misconduct actually caused tens of millions of dollars and tons of explosive materials to flow to al-Qaeda and its allies in Afghanistan. If you take our allegations as true, there is no doubt that defendants financed and armed these violent terrorists. The attacks that injured my clients, which occurred while defendants' assistance was flowing, were a foreseeable consequence of the illegal activities the defendants assisted. And so the complaint states a claim under this Court's precedence in Kaplan and Honickman and, indeed, under any reasonable standard. To hold otherwise risks making... And I presume you would say under the Twitter decision as well, you've left that out. Oh, sure. And as we explained in our reply, I think we spent seven pages on this, we don't perceive any material distinction between the legal standards articulated in Twitter and the ones embodied in this Court's decisions, which were specifically about banks, and therefore we think are the lower on-point decisions. This Court's decisions, Kaplan being the most instructive, involved banks that actively participated in terrorist finance efforts. That is very, very different from the fact pattern that gave rise to Twitter and its discussion of the law. Much of the discussion in Twitter focused on... And this is a function I should add. Well, but it's also quite different from... The banking activity in Honickman was directly involving with agencies of Hamas and other terrorist organizations, and although the association of those agencies was charitable in the sense that they were providing benefits to people, to orphans and others, they were also used as part of their recruiting techniques, as Honickman acknowledged. But here in the fertilizer context, you mentioned the fertilizer, the fertilizer sales were... The distribution of the fertilizer was quite a bit downstream, was it not, from the manufacturer to when it ended up in the hands of the terrorist organizations? I don't think it was quite a bit downstream. It was, if anything, maybe one, perhaps sometimes two steps removed from the manufacturer. Well, so how does one have a general awareness that it's a... That it's aiding and abetting and having some kind of conscious understanding that you're lending support or playing a role in the development of IEDs when you know that your product's going to end up in the terrorist's hands? Not of your doing, but of someone else's doing. Thank you, Judge West. There are a few facts that are alleged in this complaint that we think make the inference easily plausible, certainly at the pleading stage. The first is that this fertilizer from these specific factories was used in a massive percentage of IEDs. 70%. Upwards of 80. Upwards of 80% of the box, and they were responsible. I'm sorry, can I just... When you say this fertilizer, you mean the can fertilizer? Yes. And do we have allegations... Just to understand what that data point means, we have allegations that these two fertilizer companies in Pakistan are the only companies that produce the can fertilizer? These are the fertilizer companies responsible for producing the fertilizer used in 80% of the box. That's the allegation. Yeah. And so the way we know that is that oftentimes when the fertilizer was seized, for example, the name of the company is printed on the bag. And also there were just known facts about the nature of the supply, as you say. These companies have a virtual monopoly on the can in the region. A virtual monopoly. Yep. And so that's one fact. The second fact is that there was a drumbeat of public reports, starting even before then, but most prominently with the Associated Press' article in September of 2011, highlighting the role that this fertilizer played, and indicating also that the companies were aware of the problem, not taking any steps to control their fertilizer, and were in ongoing dialogue where they were refusing to do anything about it. From there, the public sources only get stronger. So, for example, we cite, and you'll find this in pages... 312-14, paragraphs 518-20. Lieutenant General Michael Barbera, who was the head of the joint INT defeat organization, gave testimony before Congress. And in that colloquy with a member of Congress, the member of Congress was saying it's outrageous that they seem to be supplying this fertilizer to the terrorists for use against American soldiers, and said it's likely because the Pakistani ISI, the Inter-Services Intelligence Agency, a rogue institution, was trying to keep an open supply line of fertilizer open to the Haqqani Network to use in bombs. That was housed in the public record in 2012. And then in late 2012, early 2013, General Barbera visits Standard Chartered Bank itself in New York. This, you'll find in paragraph 529 of our complaint, on pages 317-18. And we have a nine-bullet-pointed list of what was communicated at that meeting. And the communication that matters the most is when Lieutenant General Barbera explains, your financing services are enabling bombings. Please end this customer relationship to save American lives in Afghanistan. We think that is important enough to be... Oh, yes, sorry. That's all right. Let me ask a question if I may. I'm struck by a passage in the district court's opinion, and I'll read it from special appendix page 10. Despite its length, 173,603 words spread out over 596 pages and 2,045 paragraphs, the complaint is less a novel and more a series of vignettes describing a wide range of criminal activity. Now, that prompts me to ask very simple procedural questions. First of all, we're at what stage exactly in this proceeding? The pleading stage, Your Honor. So you never had any discovery, is that right? That's correct, Your Honor. And what is it that you want us to do? Let's assume for the argument that you prevail, that these 173,603 words prompts us to keep you in the game. What exactly would be the decree of our court? Your Honor, I think that to reverse, you would have to hold that the district court erred in finding that the complaint fails to plead the elements of general awareness and knowing and substantial assistance. So that would be the opinion that you would issue. There are some things that will then happen on remand, just to be clear. So some of the defendants have raised personal jurisdiction defenses that the court did not breach. There may be other arguments that have to be fully ventilated on remand. Some of the defendants made a challenge to the complaints under Rule 8, talking about some of the length that you were just describing. We think that that challenge is meritless, but we're open to amending if it helps. The idea, Your Honor, is that the case will be amended. Did you ask for an opportunity to amend the complaint? We did, Your Honor. We said if there are deficiencies in the allegations, we would love to hear them by amendment. The district court deemed that futile. I want to be clear. The Rule 8 argument has not been pressed on appeal. The personal jurisdiction argument has not been raised on appeal. I think they're properly addressed only in the remand posture. And so if you were to rule in our favor, you would say the district court erred in holding that we don't stand to complain, and then the remaining issues would be up for grabs on remand. So, from your point of view, the decree of our court will be relatively simple, right? I think so, Your Honor. I think you could straightforwardly say, under this court's precedence, especially Kaplan, the complaint states a claim because it alleges criminal financial misconduct resulting in terrorists obtaining access to tens of millions of dollars and tons of explosive materials. And the terrorist attacks that occurred in Afghanistan were a foreseeable risk of that activity and, therefore, actionable under the Justice Against Sponsors of Terrorism Act. I don't think you would have to go any broader than that to rule in our favor. I'll wait. What would you do once—help us a bit—describe to us, or to me at least, what would happen upon remand to Judge Brooks? We would love to begin discovery. What kind of discovery would you want? Sure. So, I think the main point of discovery that we would be seeking from parties in this case would deal with scienter questions. At the pleading stage, scienter inquiries are naturally generous to the plaintiffs because we haven't had the benefit of discovery. We have done our level best to explain why these transactions are not routine, explain why the defendants knew they were engaging in criminal enterprises, and explain why the defendants, in the cases where the transactions weren't criminal, like the FASMA transactions, had specific notice from people like Lieutenant General Barbero about what they were doing. But we would want to know more about the full scope and extent of their activities vis-a-vis these criminal customers and about their scienter at the time they engaged in those activities. Absolutely. So, we'd be seeking things like customer files relating to the Konami Money Laundering Organization, the Russian mafia organizations that have funded terrorists and been a conduit in the opium pipeline, and other criminal customers. There's already substantial discovery about the FASMA transactions and parallel litigation going on in the district court. Our amici here can speak to that a little bit. Those cases are quite well known. We could find efficient ways to port that discovery over as it relates to the FASMA allegations. But then, of course, we would be, I'm sure the other side would want discovery from us about the nature of the injuries our clients suffered, what they were doing in Afghanistan, and so on. So, it would be ordinary civil litigation of the type that is occurring in district courts in this circuit in several other cases, including the Barakasa case, including the Khabib, a limited case, and other ATA cases. Is it enough for a manufacturer's product to simply end up being a part of a destructive mechanism to bring liability for the manufacturer's banker into play? So, what has to happen for the manufacturer, from a manufacturer's perspective, is the manufacturer has to have some skin in the game of the wrongful act, right? I mean, the manufacturer has to in some way commit a wrongful act. I don't think that's right, Your Honor. Let me give you a scenario. I produce 100,000 widgets, and 20% of those widgets end up in a terrorist's hands, but they're after a sale nine steps down the commercial transaction. Am I responsible for the terrorist acts in some way, or my banker responsible if my banker knows that 20% of my widgets are involved in terrorist acts? I don't think so. Because I have no control over the distribution network, and my widgets end up where they end up. Well, perhaps that's part of the story, but I think here's what I would draw your attention to. I understand this is different, but go ahead. But I'm talking about law here. I think a place to look for a discussion about this that's helpful is the Supreme Court's Twitter opinion. So there, the Supreme Court says, ah, you've got social media services, and people abuse them, but you're not really trying to provide them to the bad guys. All you're being accused of is you didn't do enough to stop them. That's not going to be enough. Well, what they said, what Justice Thomas said was that the Ninth Circuit's mistake was that it took the premise that Twitter was somehow, in essence, helping ISIS, just helping ISIS generally, and that wasn't good enough. They had to know more than that. They had to know that what ISIS was doing, like planning terrorist attacks on Twitter platforms or other social media platforms, they had to be more than just a telephone line, right? But one passage of Twitter I think is particularly instructive here. The Supreme Court identified situations in which a secondary defendant could be liable for either all of a terrorist group's attacks or a definable subset of them. And some of those circumstances include if the defendant provided routine services in an atypical manner or if the defendant sold particularly dangerous wares to a terrorist group. And what we have here, Your Honor, is we have allegations that Fatima was selling dangerous wares deliberately to get them to terrorist groups. That is, that Fatima was not just Joe Schmoe Fertilizer Company with no interest, but that in fact the ISI was influencing it to keep a fertilizer supply pipeline open to the Haqqani Network in al-Qaeda, and it was ensuring that steps were not taken to stop its fertilizer from being weaponized  So those seem like relevant arguments. Were you suing Fatima for a secondary liability? So then the next question is what were the bank services doing that contained a level of culpability? And you mentioned not routine. You've said a couple of times, and in your opening argument you said bespoke and carefully structured. Point me to the allegations in the complaint, if you would, that establish accepting them as true. Those non-routine services being provided. So setting general awareness aside. So is it okay if I can do this in unit order? I would love to talk to you a little bit about the law of routine transactions versus non-routine transactions and how that works in bank cases, but I also want to give you the complaint citations that you're looking for. I'd start with the complaint citation. So we have multiple allegations that I think are relevant. The most obviously relevant one is one I gave you already. That is at 529, Lieutenant General Barber who visits the bank. No, no, no. I think that's general awareness. Right? I think that goes to Halberstam, too, when we're asking the question of general awareness of the bank. Maybe you don't want to delineate as much. But as to, I think as I read Twitter, the question of the knowledge and substantial assistance, we want to see what banking services are being provided that are, to use your words, bespoke or carefully structured. And maybe I cut you off too soon. And so the services that are provided, I want to be clear. There are certain banking services where banks don't really play a role in the transaction. Imagine using your debit card or cashing a check. The bank is not going to have a lot of front-end review or involvement in that. Bots and Bonds' relationship with Standard Chartered is quite different. They are getting, for example, eight-figure loan facilities from the bank that they're using to facilitate production of the materials in question. They're getting trade finance. I mean, I guess it's a level of generality question then. When I understand routine, I understand it to mean, kind of to use your words again, bespoke and structured toward the criminal-related entity. Like in Kaplan, we're going to help not disclose the identity. So what, I mean, what here, so they provide a large funding source to this entity, but I presume, because I don't see anything of the contrary in the complaint, that they do that with lots of entities. What's specifically structured or bespoke with respect to these entities as alleged in the complaint? Yeah, so here I do think we are using routine in slightly different senses, and I do want to deflect that. So I think that routineness must encompass the bank's awareness that the company it is funding and the product it is helping the company produce is used in these funds. I don't think you can take that out of the equation, because I think if you were to say, here's like a super-duper easy example. Let's say Osama bin Laden walks into a bank and says, I'd like to open a checking and a savings account. There's nothing non-routine about that, but if the bank knows this guy is Osama bin Laden. Isn't that Twitter, though? Isn't that ISIS using? Actually, I think it's a hypothetical that was raised at oral arguments at Twitter about something that would be different from Twitter. The issue in Twitter was really that when the accounts were being opened, there wasn't any front-end screening or knowledge about who these people were. One thing Twitter did, to its great credit, was it dropped terrorist accounts when it became aware of them. And so what I'm positing is a situation where a bank, with knowledge of the nature of the customer, nevertheless affords it services that are very, very helpful to the customer's illicit enterprise. Even if those services would not be regarded as super-weird or anything like that, as folk. Even if those services would be thought of as routine. We actually have a section of our complaint, I think it's part 3L, the subject heading of which is something like, the defendants knew that even ostensibly routine transactions for their customers would facilitate terrorist violence. And so we think even if the transactions are, in that sense, in the sense that they resemble ordinary banking activity routine, they can still be culpable. And I'll just flesh this out on the law side. So first, there is good law that says that if transactions are routine, it's not a case killer. It just means you need a heightened showing of scienter and assistance. In the Potsdam case, we have none. We have very high scienter in the sense that they know this is the product that's used in 80% of the bombs to kill 90% of the Americans, and that our financing is enabling that. Certainly after they have a face-to-face meeting with the head of the guy trying to stop all the IEDs, they know that. And we argue they knew before based on the public sources. And then substantiality for the same reasons. Essentially, yes, their money is enabling the flow of that fertilizer in amounts sufficient to carry out every attack in this case many, many, many times over. Now, there's also good law for us on this point. We cite these cases on pages 18 and 19 of our reply brief. These are the common law cases involving banks that the Supreme Court itself cited in Twitter. And so there is one called Monson v. Consolidated Dress Beef. There is one called Woods v. Barnett Bank. And there is a case called Edna Casualty Insurance from the Sixth Circuit, which is a more recent case. That wasn't cited by the Supreme Court, but cites Woods and did Monson. And the basic principle in these cases is, in all of them, the banks were accusing frauds by their customers. And the way that that went is that the bank provided something that looked really a lot like pretty routine banking services. In one case, they provided a letter of reference that said, yeah, these are good customers. They provided by their agreements in the past. In another example, they provided a normal commercial loan of a four-day duration, and that was it. And in another example, they provided a loan, and they didn't exercise their power to stop the customer from borrowing from other sources because they knew that because their loan had superiority, all the money coming in from the other sources would come to them. In all three of those cases, the court said the bank could be held liable for aiding and abetting those frauds because it benefited from the customer's illegal activity knowing what was going on. And surely the same is at least true here. And again, what we're talking about here, because I do think knowledge is highly relevant to this routine, not routine question, both relevant to whether the services are routine and relevant to whether, if they are routine, they are nevertheless culpable. And because at the pleading stage, I don't think it's common to decide knowledge questions conclusively against plaintiffs when they've alleged as much as we have, I think the right answer would be for the case to go forward and for there to be further elaboration on these points. And that, by the way, is taken from this court's precedence in Linde. The court expressly said that whether transactions are routine or not is a question of fact for juries to decide. The court echoed that in Kaplan. So back to the original question about what paragraphs to look at in the complaint, you want to point me to knowledge. What I've put in the bucket of allegations going to general awareness, your argument is those allegations. But in terms of other citations that may help you, I think the proposition is true, that funding the bomb factory is a routine thing. It's such a highly dangerous good that was in fact being used as the bank knew that it can't just simply be brushed aside as routine. It's a fact, though. But I also think that when we talk about routine, and I realize, Your Honor, that we shouldn't conflate the two. They are a little bit different. But there's a temptation to think of routine banking and think of it like the transactions I was describing earlier, you know, cashing a check, using your debit card, where the bank is passive, like your defendant was in your Twitter. And I think that that's a lot of what was animating what the court was talking about in Twitter. But your allegations for non-passivity are knowledge allegations. Not just knowledge allegations, but also like providing a fee for your loan is not like – Well, I don't know. I mean, banks provide loans, including big ones. So what allegations make that non-routine? So again, like I said, I don't want to conflate the two. The important thing to understand from our perspective is it's not passive, right? It's true. Loans are a routine banking activity. So is the loan in the ethnic casualty case, right, $275,000 loan, or in the Barnett Bank. Those are routine lending activities. Sorry, Barnett Bank wasn't the loan. Monson was the loan. Those were routine-looking loans, but nevertheless, they were deemed to be culpable in the context of the enterprise aid. That's also language from this court's decisions going up from Halverson. Even acts that are mutual standing alone can be culpable in the context of the enterprise they gave. And so we think the enterprise takes it out of being routine, along with the size of the transactions and the specific communications to the bank explaining that these transactions are causing those attacks. Let me ask you – one point I wanted to hit that we haven't discussed. The nexus requirements – you gave the vivid example of the company's logo being found at the sites of the IED. What allegations in the complaint do we look to to know that there's a nexus between the services provided and the act – because that's the language that Twitter tells us – and the specific act that caused injury to your clients? Yeah. Relatives. Yeah. So I think for the FATMA allegations, the nexus allegations are pretty easy for the reasons you give. This fertilizer from these companies was used in overwhelmingly large percentage of the bombs. And so overwhelmingly isn't 100%. Your argument is that it's sufficient that any terrorist act caused by the syndicate with an IED, the banks are responsible for, even though – sorry, standard charter, right – because the fertilizer of the two fertilizer companies is used in not 100%, but something less than 100%. Yeah, but 80% of bombs, 90% of casualties is the figures that we reported. So we think 90% of the casualties are directly attributable to those bombs, and we think that that's more than enough. Again, think about Kaplan. That's a case where the attacks were rocket attacks. The support was provided to two investment companies, the charity, and two individuals. And the charity had the sort of closest direct nexus to terrorist activity. They paid off suicide bombers' families. But they weren't suicide attacks. And yet the nexus was deemed sufficient, because when you provide money to these organizations that is directed to their violent activities, you can't really predict exactly where they'll use it or how they'll use it, or you provide resources to their violent activities. It's impossible to trace things at that level of granularity. The Supreme Court never said that you do have to. From the other allegations in this case, what I would rely on, Your Honor, is that the Supreme Court continue to acknowledge the principle that this Court really emphasized in Huntington, and I think it's fundamental to how any and many more sons of common law, and fundamental to this statute in particular. And that is the principle that you are liable for the foreseeable risks of an illegal activity you assist, even if that activity is not itself an act of international terrorism. The Supreme Court acknowledges that this principle remains as vital as it ever was. And so our point for the financing type of allegations is we have really robust allegations, and I can walk you through them for each kind of support if that would be helpful. I can give you the cites. But we have really robust citations saying that when you helped Altaf Kanan, the funds would flow through. We identified seven different ways that he supported the syndicate, such that working transactions would cause money to flow to syndicate terrorists in Afghanistan who were engaging in these violent activities at the time. We've identified specific terrorists who would be the beneficiaries, including Sirajuddin Bukhani, who was a military leader for al-Qaeda and the Taliban. We have allegations there. Okay. I think we're well over, and you do have a few minutes for rebuttal. Thank you. Thank you. And we'll hear from Ms. Kastanek for three minutes. Amikis. Thank you, Your Honors. And may it please the Court, I'm Adrienne Kastanek on behalf of Amiki, for plaintiffs and litigation entitled Bonacosta v. Standard Turkey. The Bonacosta plaintiffs are family members of servicemembers who were killed in Afghanistan, and they share in common one discrete set of allegations with the plaintiffs in the Ashraf case before the Court today, those alleging that Fatima even abetted the al-Qaeda syndicate by knowingly financing Fatima, which produced pan, used in IEDs and other fertilizer bombs. Mr. Singh, on behalf of the Ashraf plaintiffs, has comprehensively covered this discussion, but I wanted to point out, for Your Honors, some of the allegations that Judge Ramos in Bonacosta found persuasive and to state a valid aiding and abetting claim under JASTA in contrast to substantially similar allegations in the Ashraf claim case that Judge Gonzalez did not find stated a claim. So the allegations that Judge Ramos cites are that Fatima was supplying a vast, unregulated quantity of pan to the al-Qaeda syndicate, and Judge Wesley's question about suggesting that those goods may end up in the hands of the al-Qaeda syndicate, that is not accurate as to the allegations. So it's that these quantities of pan actually did end up in the hands of the syndicate. So the Bonacosta complaint cites it in 2012. It may well be that they did, but the question is how did it get there. Sure, Your Honor, that's true. But if we look at some of the allegations in Bonacosta, paragraph 110 describes that in 2012 alone, the U.S. military seized 440 tons of pan in Afghanistan. Fatima was the primary producer through the two factories that were in Pakistan of that pan, and we're not just talking about ordinary garden mulch that you pick up at Home Depot. To put this in context, pan is the same material that Timothy McVeigh used to blow up the building. But I presume it's used in agriculture? Yes, Your Honor. Right. The Bonacosta complaint has a number of allegations I can point you to about the very low amount or percentage of the use of pan in legitimate agricultural uses. So the Bonacosta complaint in paragraphs 96 and 98 detail that pan makes up only 5% of legitimate agricultural use in Afghanistan. The Associated Press article from 2011 that my colleague alluded to cites that it makes up 10% of legitimate agricultural use in Pakistan, and by contrast, it makes up 90% of casualties from IEDs in Afghanistan, from IED casualties in Afghanistan. So the proportions here are pretty significantly out of alignment. All right. Thank you. Thank you, counsel. Thank you, Your Honor. Appreciate it. We'll hear from Mr. Wall. Judge Nathan, can you please support the court? The complaint is nearly 600 pages long. It's a little shorter than Dostoyevsky's Crime and Punishment. Whenever you have that much to say, it is possible to characterize it in virtually any way, and plaintiffs have. But Judge Gondal has done a remarkably thorough job of setting aside the often misleading rhetoric, parsing the substance of the allegations, and explaining why, even under this Court's pre-clear cases, the plaintiffs have not sufficiently pleaded that the banks knowingly and substantially assisted al Qaeda in conducting roadside bombings against Afghanistan in the early 2010s. That conclusion seems to us inescapable after Twitter. The Supreme Court's overriding message there is that aiding and abetting liability under the ACA should be compliant with cases of truly culpable conduct. Those who consciously assist terrorist groups and aid in particular attacks. Plaintiffs do not and could not plead that. Now, there are three buckets of allegations in the complaint. That fraud, so-called money laundering or the failure to adequately enforce anti-money laundering rules in places like Russia and Estonia, and fertilizer. The argument is focused on fertilizer so far. So if I could start there, Judge Nathan, but I would like to talk about the other buckets at some point. To turn you, Judge Nathan, to the important allegations in the complaint for the substance of what happened. I think the key allegations are 513 to 515. They appear in 310 to 311 of the Joint Appendix. Those allegations say that approximately 1% of the fertilizer manufactured in Fatima, and I'm reading from the complaint, was smuggled by militants and their suppliers across the forest border into Afghanistan according to U.S. officials. The U.S. military says around 80% of Afghan bombs are made from fertilizer. So that's the substance of the allegation. You have a legitimate company in Pakistan. Nobody disputes this. These are legitimate companies. They manufacture a fertilizer that is popular in certain places, Judge Nathan, depending on the acidity of the soil, the ammonium nitrate. This particular kind of fertilizer, you can't use it everywhere. You can use it in certain places. So it's certainly true. Not every farmer uses it, but a lot of farmers do. About 1% of what they're producing is making its way across the border in Afghanistan, is being diverted, and it's being turned into bombs. That's the substance of the allegation. Then, okay, well, what services did the banks provide wherever you look from that? The closest I can point you, Judge Nathan, is paragraphs 527 and 529 of the complaint. 527—or, sorry, 525 says—talks about the—let me make sure I have it right. Standard Chartered Bank facilitated U.S.-denominated commercial sales operations and financing. No specifics. 527 says U.S.-denominated foreign exchange correspondent account and letter of credit services. Are you reading? Can you give me a page? 316. Sorry, it's 516. 316. It's 316 in the J.A. Thank you. What we're talking about here, Judge Nathan, are the same kinds of financial services that banks provided, that Standard Chartered provided in Pakistan, to other customers of the bank. And I think what is so useful about Kaplan and so useful about what Judge Gauz did, as I understand the court's pretrial cases, I understand the divide between Siegel and Honigman and Kaplan, something like this. Those cases were focused on general awareness, not knowing substantial assistance, but the idea was, in Siegel and Honigman, the banks didn't know that the intermediaries were operating on behalf of the terrorist organizations. In Siegel, it was Al-Raj Bank, which was supposed to be operating on behalf of al-Qaeda in Iraq, and in Honigman, it was Long Bank and certain affiliates of FOMOX, and so forth and those. And in both cases, the court said that the banks didn't know enough about the intermediaries to have general awareness. Then along comes Kaplan, where there is an allegation that it's public that their affiliates have been locked in. This is the other important point. It's not just a routine service. The allegation is that they're making exceptions to the daily limits on cash transactions in order to enable those affiliates. They're altering their own rules for one particular customer which had a particular association with a terrorist organization. That's exactly right, and I think that that's the kind of allegation that still survives Twitter. And so I don't think that Twitter – I think it unsettled some of the analysis in those cases. I think it raised the bar in certain ways that we could talk about, but I think the results probably end up the same across the cases. And what I think it highlights is this case, as Judge Gonzalez correctly said, is more like Siegel and Honigman than Kaplan because every time you get down to the specifics of the intermediaries, a ZZ and a MED with respect to that from a – Well, so just – so it's hard to move a little bit because some of the cases are general awareness, and then Twitter is substantial assistance, and there's overlap. Obviously, it's a sliding scale, but with respect to general awareness, why isn't it more like Kaplan where you've got military personnel coming in and saying, according to the allegation, saying to the bank, these fertilizer companies that you are financing are making fertilizer that's being used in 90 – whatever, in a substantial portion of the IEDs being used in Afghanistan. Why doesn't that get you general awareness? It doesn't mean you have questions about substantial assistance, but why doesn't that get you general awareness? So first of all, I just want to set aside the other two buckets because it wouldn't apply on the math part. Just fertilizer. And then so we're only talking about one of the banks, so only standard charter for the fertilizer. I think that allegation is the best for them on general awareness of their allegations. I don't think it gets them home under Honigman because Honigman says closely intertwined, and it's hard for me to see that where you have a legitimate company that's doing a lawful business where it operates, still operates there, and you have a product, 1 percent of which is being converted, and you're told that your customer has product that's being converted. I don't think that that's closely intertwined with a terrorist group to satisfy Honigman, but I'll grant Judge Nathan that's the best for them on general awareness. I see the argument. I don't think it's enough. The problem is it won't get them right into knowing substantial assistance because when he's – and that, Judge Nathan, is – as you pointed out, that's the Twitter case. The complaint in Twitter alleged that the social media companies were unnoticed from the White House, from members of Congress, and were being implored not to allow ISIS to use their sites, take down their content. And Justice Thomas, the defendant for the court, notes that at pages 1216 and 1217 of the Supreme Court report. He says the plaintiff said that the social media company knew it and that they failed to take this material down and that ISIS was using these sites to fundraise and radicalize. And the court goes on to say that's not enough. Now, if you know that using your site isn't enough, this is one that would be removed from that because it's not like the banks are doing business with or producing products or services that are being used by terrorist groups. They're banking lawful customers and then being told, just like the social media companies Twitter, those lawful services are being converted. That may or may not be a problem under their own rules. Well, I think – go ahead, Judge Kavranos. The passage that you referred to, Justice Thomas, what would have satisfied the test that you imputed to Justice Thomas in those pages? So, Judge Kavranos, the Supreme Court addresses that. It has a passage when it applies its new rules to the social media companies. And after saying that what the social media companies did was not enough, it says – and this is at pages – Sorry, Twitter. It's at page 1228 of the Supreme Court report. And the court says, look, we're not saying that providing services to a market can never be enough for liability. If you provide direct, active, and substantial aid directly to a terrorist group, they say – And how would that be achieved? And they give two examples. They say, have you ever had a situation where you provide routine services in an unusual way? So that would mean that because you're breaking the normal rules, we can infer that you culpably and consciously wanted to aid the terrorist groups. Or they say if you're selling dangerous wares directly to terrorist groups, they say, that might be enough. How would – can I interrupt for a second? How would that be accomplished without discovery? Well, I think Kaplan's a great example of that where they walked in and alleged that the bank was violating the normal rules in order to bank affiliates of a terrorist organization in ways that other customers wouldn't be able to take advantage of. And Judge DeFrancois, they could have walked in and said, we think Standard Charter is doing something really unusual with Fatima that it doesn't do with other customers in Pakistan. The reason they haven't said that in a 600-page complaint is that there's no evidence of that. Even Judge Ramos, in his reconsideration opinion – and obviously we respectfully disagree with it – recognized that Twitter had raised the bar, taken off the table some of what he had previously said was sufficient for getting a vetting liability, but said, I think the allegation that you gave alone is enough because I think that alone is the kind of affirmative misconduct that the Supreme Court had in mind. And I respectfully disagree that that's what the Supreme Court was getting at when it said affirmative misconduct as opposed to passive non-feasance. It makes clear it's not talking about doing the same sort of things in the market that you do for everyone. It's talking about, as it says, encouraging, inducing, soliciting, the kinds of things that it says at criminal law would have made you responsible as an aider and a veteran. Then it says the ATA picked up on concepts from cases like Nye and Nissen, which it supports again and again. It cites again and again. So I take the point, Judge Ramos, that there might be cases where it would be hard to allege, but in a case where you have a 600-page complaint that they were given leave to amend twice. We're on the third complaint. It's gotten longer with each iteration despite the district court's request to shorten and simplify. The one thing you would say – or one thing I don't think you should say is, gosh, we need discovery here. There's no suggestion that the banks here did anything different like the bank in Capital. And so even pre-Twitter, I don't think this case is enough. But I don't see how post-Twitter it could possibly be enough because it's a degree removed from what the court said Twitter is not enough. And just not to lose the forest for the trees, Judge Kaposch, I mean this same firm representing many of the same plaintiffs has filed substantially similar complaints against a host of companies that did business in this part of the world – engineering firms, construction firms, telecom firms. And I think the one thing the Supreme Court could not have meant by truly culpable conduct is the same sort of general you-did-things-that-assisted-the-Senate did that you could bring against a lot of different companies doing business in war-torn parts of the world that harbor terrorists. I mean this is not a Kaplan-type case where they walked in with specific allegations tied to a particular defendant that showed unusual conduct or knowledge of the intermediary's relationship with the Antillo that would allow you to infer, as the court says, that you consciously and culpably participated in terrorist activity. What do you make of the assertion by the military officer that Fatima refused to assist him in making the fertilizer less transportable and more easily findable when it's being smuggled by adding dye to it? Doesn't that put Fatima in a bit of a different light than just a manufacturer putting his product out into commerce that ends up ending up in the hands of folks who have nefarious intentions with regard to its use? So I'll say two things. One, I think if the suit were against Fatima and I were their lawyer, I'd still be up here saying… accusing them of being involved in some kind of conspiracy with them. But he's drawing a connection between their product and the regularity of its being lethal to American servicemen in Afghanistan. And he then implores them to assist them by applying a colorful dye to the fertilizer to make it harder for it to be smuggled. And the manufacturer refuses. Doesn't that then begin to take the needle a little bit away from neutral and towards taking a side? So two things. The first is the same argument is on the table on Twitter. And I think in some ways it's even more powerful there. And then the knowing is, what is it that they're doing? And how is it connected? And is it connected in such a way that we know that we're then lending a hand? Right? I mean, I think that's the way to understand it. And the Ninth Circuit just confused that. And I think it's a legitimate… it's nice for… Kai doesn't write, so I don't have to own it. But it's a legitimate criticism, I think. And I think that there are… you know, looking back now, I think that I can see aspects of Honickman that might be understood that way. I'm not certain that it's the right way to understand it, but we have to understand Honickman now in the context of what Twitter tells us. You know, the other amici wants to tell us that Honickman's a dead letter. Well, we'll figure that out another day. But in any event, I mean, doesn't this alter the equation in the context of Fatima? How do you look at this manufacturer now and say, well, you know, they're just a manufacturer? They're a manufacturer who knows that its product is ending up killing people. Not that they're directing it or even that they're in a conspiracy to direct it. And then they say, we're not interested. We're not interested in minimizing the risk to American citizens. So I just want to say two points. And the first is I don't want to focus on the Ninth Circuit's errors in Twitter because the court was pretty critical of the Ninth Circuit. I want to focus on the case in the Supreme Court. Understood. Fair enough. Because in the Supreme Court, the plaintiffs in their briefs in an argument said not only did the social media companies know it. They were told by the White House. They were told by Congress. They were poor, high-level government officials up to senior folks in the White House. But they refused to take the channels down. And because of that, they're implicit. They are the reason that ISIS is able to raise money and raise recruits, and they are the reason that our soldiers are dying overseas. And the Supreme Court was entirely unmoved by that allegation. So it looked at that and said, whatever one thinks of that conduct, it is not the kind of conduct that traditionally common law first criminally and then later… Well, because it referred to the algorithms as agnostic. And so it took it not as some kind of culpable in the sense that they were joining in or sharing in or mindful – not necessarily mindful, but being a facilitator and being consciously aware of the objective. It wasn't part of the algorithms, but it was also the failure to take down the channels that ISIS was using. And the social media companies said we're not going to do that. We're not going to start taking down some channels because you want us to. And I think that that is arguably more culpable than just the failure to keep your product from being converted. But whether or not you agree with me that the allegations that you found looked to be pretty similar to but even a little weaker than the allegations against social media companies… I wasn't taking a view. I was asking you what your view was. Right. So my view is whatever comfort I would play out if you sued Pashma and Paparov under the ATA for getting in a vetting liability, it can't possibly be enough on what you are talking about. It's just the financial institution that banks these legitimate companies. And I take the point that somebody came to them and said we asked the company to do more. It didn't. And now we want you to stop banking them just like we want you, Google, to take down the channels on YouTube that ISIS is using. And the bank didn't do that. But that I don't think under clear could possibly be the kind of deferred misconduct. Even Judge Ramos didn't go by that. Judge Ramos just said it's the loan. And I don't think the loan itself, unless you can show it was bespoke, it was carefully structured, it was capital, you did something you wouldn't have done for everybody else. And they used that language. They say it was structured or tailored. But as far as I can tell, I mean, when I look at the substance of the allegations of both cases, what they mean is just you tailored the loan to the customer like you would to anybody else. How much money do you need? What facility do you need? For how long? What interest rate? I mean, there's no capital-like allegation that you're doing something for the company. If regulation and good banking practices says you don't – you're cautious about big loans to entities that are involved in criminal activity, and then you have the military coming to the bank and saying they're not working with us to make this fertilizer less deadly that finds its way into Afghanistan, isn't the proceeding with routine business services at that point non-routine? I don't think – back to Twitter a little bit, because they were on – the social media companies were on those for a long time. And the argument there was, boy, that's not routine anymore. When you know the channel's up and you know ISIS is using it, then you don't take it down. And the Supreme Court sure seems to me to have looked at that and said, that's not what we require at common law. We require affirmative misconduct, which when it walks through cases like Nye & Nissen, it says it's encouragement, inducement, solicitation. It's not knowledge that you are putting some good or service out into the world that's being misused by others. That may be, the court says, deplorable for various reasons, but it's not feeding and vetting liability at the common law. And if social media companies aren't liable there, I mean, as I say, we are a step removed from that because the allegationaries at least, they're directly dealing in some way with the terrorist groups. And here we are a step removed from that. And the one thing the court's very clear about in – at pages 1228 and 1230 of the opinion is if you've got direct – a direct nexus that says direct aid, it says, OK, then maybe we'll require less to infer culpable participation. But the further we get from the terrorist conduct, the more we're going to require. And for any of the buckets, you're at least several steps removed. On the fertilizer side, it's that we provided a load that went to a factory that made the fertilizer and didn't do enough to stop it from being diverted by militants who took it across the border and made bombs. And what the Supreme Court says is if you're going to move away, you require a lot more on the knowing and substantial assistance. You require more, it says, intentional participation and substantial assistance to the tort. And the one – and the language the court uses again and again is did you wish to bring about terrorist conduct? Did you want to see it succeed? That's the conceptual core, it says. That's what we're now trying to get at. That's the ultimate inquiry. Do we have somebody before the court that wanted the terrorist conduct to succeed? And the one thing you can't say about any of the buckets of the allegation, which is not in the complaint, any of it, it's just not in the case, is that these banks wanted to see this terrorist conduct succeed. That's a difference from capital. The allegation there was that they were specifically enabling it with public statements that suggested that they did want to see the financing flow to the terrorist group. And so I understand Twitter not to sort of change the results here, but I do think it raises the bar. I do think it focuses us on the conceptual core of probability. It says that you have to look at knowing and substantial assistance together and treat them as sort of part of the same inquiry. Knowledge, it says, is higher than general awareness. It's separate from. And it requires a real desire to see terrorist activities succeed. And I think Judge Gonzales got this exactly right in the pre-Twitter cases. Once Twitter raises the bar, even if they can get to general awareness for the fertilizer bucket, which I don't think is where they're at. I don't see how they get past knowing and substantial assistance. I mean, if this is it and we go back down here, I mean, there are dozens of these cases, and there are hundreds more that could be filed against any of the companies that do business in these places, all of which would be alleged to have aided the syndicate with knowledge that in some way their services downstream were flowing to, through intermediaries, the syndicate. And that doesn't look to me anything like what the Supreme Court said was aiding and abetting liability under the ETA. And we talk a lot about fertilizer. We haven't talked as much about the mat fraud with money laundering. I'll just say very quickly, the district court, I think, got the mat fraud exactly right. It says that the complaint does not sufficiently allege that either Standard Charter or Deutsche Bank knew that Azizi and Ahmed were operating on behalf of anyone connected to a foreign terrorist organization. That's not what the district court says. We're going to complain. We're going to source a complaint until 2015, at which point the bank's going to no longer be dealing with them. So just because you're over time, let me push you quickly to money laundering, because there again the district court found there wasn't general awareness, and we do have allegations of a compliance officer, and this is for SCB again, uncovering provision of services to Khamenei at the time that Khamenei is publicly identified as a money launderer facilitating terrorist activity, as I understand the allegations. So I think that what the district court said, this is page 27, 28, and 38, to bring out its opinion, is at the time that Standard Charter and Deutsche Bank have alleged to have provided services to al-Zaruni and Mazzocca, they did not know that they were alleged fronts for Khamenei or in turn al-Qaeda. And then the district court walks through the later allegations and says to the extent that they say there was knowledge at some point in time, they don't connect that up to any of the Standard Charter defendants through things like whistleblowing or any of the rest. So the district court walked through all of that and I think explained why they don't show that any of the Standard Charter defendants here had any awareness of that. Now that's, I will say, one of the two money laundering pockets right there. The one is the Dubai Shell companies, and the district court said that's the only one, there's not a sufficient allegation that you knew that they were fronts. And then there's the much more generalized laundromat, Russia, Estonia, and there the district court said there's not knowledge that it's connected up to al-Qaeda or the specific attacks. And I think that's right under general awareness, but certainly post-Twitter, I don't see how you satisfy either the conscious participation or the nexus from with respect to those kinds of generalized allegations. Which, by the way, are really just that there were banks in certain parts, branches of banks in certain parts of the world that were not sufficiently observing their AML rules, which allowed people to come in and engage in transactions that the allegation goes that they shouldn't have. That may or may not be true, but none of it shows that these banks were consciously attempting to aid terrorist activity in Afghanistan. Thank you, Mr. Wall. Mr. Singh, you have three minutes for rebuttal. At the pleading stage where the court is meant to draw inferences in our favor, I think that Mr. Wall's characterizations of the money laundering activity simply can't stand up. We've alleged, and this is just projected fact, these companies have paid hundreds of millions and sometimes billions of dollars in criminal and other penalties for the same conduct underlying this. This wasn't just failure to follow a couple of rules here and there. It was quite serious deviations from the norms of ordinary banking. And so to the extent Mr. Wall emphasized this for you, how in Kaplan they let them raise the cash deposit limits. What we're talking about here is so much worse for so much longer on the criminal finance side. As to whether there was sufficient knowledge of the customers' connections to terrorism in this complaint, I'll admit it's long, but hundreds of those pages are devoted to this proposition. That is, to fleshing out exactly how these types of transactions with these sorts of customers in these geographies were uniquely likely to cause money to flow through to Afghanistan in terrorist air, and in fact did so. I want to quickly touch on the fertilizer allegations now. Please read the parts of the complaint starting in paragraph 518 and moving through 530. These are—they start at Joint Appendix page 312. The critical pieces you will glean from them are, number one, that Fatima was in league with the ISI making fertilizer available deliberately to terrorists in the Bukhani network. This is not just a company whose products incidentally ended up in the hands of terrorists. There is a reasonable inference at the pleading stage that they wanted that outcome to happen. Second, you will glean that the standard charter was a major banker for the company, supplying lots of money despite public reports not only saying that fertilizer is used in bombs, but also saying that Fatima is a recalcitrant company whose actions seem to suggest that they don't mind that outcome one bit. And third, you will see the extraordinary meeting between Lieutenant General Barbero and Standard Chartered Bank itself telling the bank that its own financing activities were enabling terrorist violence in Afghanistan. I do not know how much clearer a message needs to be delivered. Now, Mr. Wall says the same kind of message was delivered in Twitter. I will say not so. If you look at the Twitter opinion, specifically in footnote 13, the court says, the plaintiffs themselves acknowledge that defendants attempted to remove at least some ISIS-sponsored accounts and content after they were brought to their attention. That's tied to a part of the text where the Supreme Court says, plaintiffs never alleged that after defendants established their platform to give ISIS special treatment or words of encouragement, nor is there reason to think defendants selected or took any action at all with respect to ISIS's content except perhaps blocking some of it. Twitter was a responsible citizen in reaction to reports that this product was being used for terrorists. Standard Chartered continued its relationship with Ottema, blowing off the government after the government said, please stop doing this. The contrast is apparent, and at least the completing speech, we think, easily supports a timing of the complaint's cease. Thank you, Mr. Singh. Thank you to all counsel. Very helpful. Thank you.